**SOUTH MACOMB DISPOSAL AUTHORITY, Plaintiff,**

v.

**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, Defendant.**

Civ. No. 87–CV–3140–DT.

United States District Court, E.D. Michigan, S.D.

March 11, 1988.

Roy W. Rogensues, Roy W. Rogensues & Associates, Fraser, Mich., for plaintiff.

Arthur E. Gowran, U.S. Dept. of Justice, Washington, D.C., Geneva S. Halliday, U.S. Attorney's Office, U.S. Dept. of Justice, Detroit, Mich., for defendant.

## MEMORANDUM OPINION AND ORDER

PHILIP PRATT, Chief Judge.

The South Macomb Disposal Authority (Authority) brings this suit against the United States Environmental Protection Agency (EPA) challenging the constitutionality of the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA), as amended by the Superfund Amendments and Reauthorization Act of 1986 (SARA or 1986 Amendments), codified at 42 U.S.C. § 9601, *et seq*. Before the court is the EPA's motion to dismiss this suit. The EPA argues that this court lacks subject matter jurisdiction, that there is no "case or controversy" as required by the U.S. Constitution, and that the plaintiff's constitutional challenges are devoid of merit.

This suit raises the issue of whether the 1986 Amendments deprive this court of hearing a constitutional challenge to the statutory scheme as a whole at this time. For the reasons stated herein, the court answers this question in the affirmative, holds that the court has no subject-matter jurisdiction to hear the plaintiff's claims, and dismisses the suit.

For the purposes of this motion the facts are not disputed. The Authority is a municipal organ owned and operated by five cities in Macomb County: Warren, Center Line, East Detroit, St. Clair Shores and Roseville. The Authority operates waste landfill disposal sites in order to dispose of residential household wastes collected from its member cities. Over the course of its existence, the Authority opened, filled and closed two landfill sites in Macomb Township. The landfills were conducted under State license, supervision and inspection, and met State regulations. Both sites were capped and closed, also according to State specifications.

On October 15, 1984, the EPA proposed to list the two subject sites on the National Priority List (NPL)[1]. After the required notice and comment period, the sites were actually placed on the NPL. During 1984, Michigan citizens brought suit against the Authority for personal injury damages and remedial relief under the provisions of the Michigan Environmental Protection Act, M.C.L. § 691.1201 et seq. *Bielat v. SMDA*, Macomb Circuit Court No. 84–612–AA. The Michigan Department of Natural Resources eventually intervened as a plaintiff, and that case is now awaiting trial. In conjunction with this litigation, the Authority recently completed a hydrogeological study, allegedly costing the Authority some $200,000. The Authority represents that this study was conducted to aid in a Remedial Investigation (RI) and to facilitate a Feasibility Study (FS) to determine what remedial action should be taken "to arrest migration of contaminants in the underground water aquifers" that may be polluted by the landfills. The Authority also alleges that the state court has ordered the installation of a "leachate collection system", apparently a device to prevent release of hazardous substances.

It is the failure of the RI/FS[2] to meet EPA standards which is the underlying cause of this lawsuit. On March 16, 1987, the EPA wrote the Authority and indicated it was investigating the source and nature of the problem at the Macomb landfills. Pursuant to CERCLA and its 1986 Amendments, as well as other federal statutes, the EPA requested the Authority to pro-

---

1. The NPL is compiled by the EPA and identifies locations containing hazardous waste. *See, infra* at 1246.

2. The court terms the Authority's hydrogeological study as a RI/FS for ease of reference. Whether the study was actually intended to be a RI/FS is not at issue for the purposes of this motion.

vide information regarding the situation at the sites. Initially, the Authority directed EPA to obtain this information from the State of Michigan. On May 8, 1987, the EPA responded by informing the Authority that it might be a "potentially responsible person" (PRP), and therefore potentially liable for contamination at the Macomb landfills. The EPA suggested that the Authority and other PRP's coordinate and present the EPA with a "good faith" proposal including a definite date and time for implementing and conducting a RI/FS for the sites. The EPA warned that if it did not receive such a proposal in 60 days the EPA would conduct its own RI/FS, using public funds and that the EPA could take legal action later to require that the Authority reimburse the EPA for this expenditure. In a letter immediately following this communication, EPA further informed the Authority that it must provide the documents requested earlier or face penalties for violation of federal law.

On March 27, 1987, the Authority responded that a RI was being conducted under the supervision of the Macomb County Circuit Court. On June 16, the Authority provided the EPA with the documents and information EPA had requested. According to the EPA, on July 10, 1987, the Authority wrote to the EPA that it was making a good faith proposal to conduct a RI/FS.

On July 21, the EPA answered that it did not agree that the Authority's hydrogeological study was adequate. The EPA indicated that additional information was necessary and that the remedy already in position at the sites—capping—was "premature." The letter does not refer to the leachate system ordered by the Macomb Court. Finally, the EPA questioned the Authority's ability to pay for an adequate RI/FS. The EPA stated it must have assurances that the Authority would conduct an adequate RI and that no remedial action be taken before the FS was completed.

Instead of responding to this letter, the Authority instituted this lawsuit on August 21, 1987. On September 28, 1987, the EPA wrote the Authority that it had not received a good faith proposal by the PRPs to conduct an acceptable RI/FS. The letter concluded that "the Agency now considers negotiations on this matter terminated and the EPA will now undertake the RI/FS."

Before turning to the question of subject-matter jurisdiction, it is necessary to examine briefly pertinent provisions of CERCLA. The United States Congress passed CERCLA "to provide a national inventory of inactive hazardous waste sites and to establish a program for appropriate environmental response action to protect public health and the environment from the dangers posed by such sites." House Report No. 1016, Part I, 96th Cong., 2d Sess., *reprinted in* 1980 U.S.Cong. & Admin. News 6119. One function of the bill was to establish a fund so the EPA could take "emergency assistance and containment actions" with respect to hazardous waste sites. *Id.* at 6119–20. Under the statute, the EPA creates a National Priority List (NPL) identifying hazardous waste sites which the EPA may clean up. In addition, CERCLA provides that the EPA may take legal action against the persons responsible for the hazardous waste site to obtain reimbursements for any public funds expended to clean up the contamination caused by those sites. 42 U.S.C. § 9607.

CERCLA establishes two categories of responses the EPA may take to ameliorate the health risks arising from hazardous waste sites: removal actions and remedial actions. A "removal action" is an immediate or interim measure, while a "remedial action" is more permanent in nature, taken instead of, or in addition to, removal actions. 42 U.S.C. § 9601(23), (24). A removal action includes "such action as may be necessary to monitor, assess or evaluate the release or threat of release of hazardous substances." 42 U.S.C. § 9601(23). It is clear then that a RI/FS taken by the EPA is a "removal action" within the meaning of the statute. 42 U.S.C. § 9604(a). Section 9604(b) states that upon determining that removal action is appropriate, the EPA may "undertake such investigations, monitoring, surveys, testing and other information gathering" as it may deem necessary.

Under § 9622, the EPA may enter into negotiations to allow any person, including the operator or owner of the hazardous waste site, to conduct the RI/FS and the actual cleanup of the site. Section 9622 exhorts the EPA to "facilitate agreements under this section that are in the public interest and consistent with the National Contingency Plan in order to expedite remedial actions and minimize litigation." 42 U.S.C. § 9622(a). If the EPA does not enter into such an agreement, it must inform the PRPs why it did not. "A decision of the President to use or not use procedures in this section is not subject to judicial review." *Id.*

Prior to the 1986 Amendments, CERCLA had a standard section granting subject matter jurisdiction to the federal courts. Under this provision, challenges to all regulations had to be instituted in the District of Columbia. 42 U.S.C. § 9613(a).

Except as provided in subsection (a) of this section, the United States district courts shall have exclusive original jurisdiction over all controversies arising under this chapter, without regard to the citizenship of the parties or the amount in controversy. Venue shall lie in any district in which the release or damages occurred, or in which the defendant resides, may be found, or has his principal office. For the purposes of this section, the Fund shall reside in the District of Columbia.

42 U.S.C. § 9613(b).

CERCLA was interpreted, however, to require that challenges to EPA actions be brought only after the remedial or response action was completed. In *J.V. Peters & Co. v. Adminstrator, E.P.A.,* 767 F.2d 263 (6th Cir.1985), for example, the Sixth Circuit determined that an EPA decision to take a response action cannot be challenged under the Administrative Procedures Act, 5 U.S.C. § 551, *et seq.* In *J.V. Peters,* the EPA was unable to negotiate an acceptable cleanup plan with the plaintiffs and determined to take response action under section 104(a). The plaintiffs brought suit to prevent the EPA from tak-

ing action, claiming that they would automatically be liable for cleanup costs.

The court first held that the EPA's actions could only be reviewed under the APA which states that "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to review." The court then stated that no cause of action should be inferred from CERCLA:

To the contrary, explicit causes of action are allowed in sections 106 and 107, 42 U.S.C. §§ 9606, 9607, but none is provided for in section 104. Because the Act's primary purpose is "the prompt cleanup of hazardous waste sites," *Walls v. Waste Resource Corp.,* 761 F.2d 311, 318 (6th Cir.1985), allowance of a cause of action prior to a response action would debilitate the central function of the Act. *Lone Pine Steering Committee v. EPA,* 600 F.Supp. 1487, 1495 (D.N.J.1985); *accord Aminoil, Inc. v. EPA,* 599 F.Supp. 69, 71 (C.D.Cal.1984).

*Id.* at 264.

*Lone Pine Steering Committee* and *Aminoil* represent two divergent lines of authority in regard to § 9613(b). In *Lone Pine,* which was affirmed at 777 F.2d 882 (3rd Cir.1985), *cert. denied* 476 U.S. 1115, 106 S.Ct. 1970, 90 L.Ed.2d 654 (1986), the EPA had issued a Record of Decision (ROD) which obligated the EPA to spend at least $17 million dollars in federal and state funds to close the Lone Pine hazardous waste site. The EPA took this action only after the plaintiffs refused to undertake an RI/FS after they were notified they were PRPs. The plaintiffs challenged the EPA's actions on both statutory and constitutional grounds. The court dismissed all of the plaintiffs' claims for lack of subject matter jurisdiction.

Both the legislative history and the language of CERCLA suggest that to allow judicial review of a ROD by an entity which may (or may not) be the subject of a subsequent recovery action would frustrate Congress' intent to provide a mechanism whereby hazardous sites can be neutralized expeditiously.

600 F.Supp. at 1495. The court concluded that there was "no reason why plaintiffs cannot raise as a defense in a cost recovery action every objection to the ROD which they could legitimately raise in a judicial proceeding at this time." *Id.* at 1498–99.

The *Aminoil* court advanced a different notion as to the scope of judicial review under CERCLA. The plaintiffs in *Aminoil* sought to overturn an EPA administrative order and to challenge the constitutionality of a CERCLA provision that allows the EPA to issue daily penalties for failure to abide by an EPA order and of a provision allowing treble damages. Agreeing with *Lone Pine*, the *Aminoil* court held that "to the extent that pre-enforcement review of the merits of the administrative order is sought, this Court lacks jurisdiction to hear the arguments raised by plaintiffs." 599 F.Supp. at 71. In regard to the penalty provisions, however, the court held that they

> do not involve the merits of the particular administrative order at issue here. Rather these penalty provisions raise a controversy involving the constitutionality of the statutory scheme. This Court, therefore, has jurisdiction over this controversy arising under CERCLA pursuant to § 113(b), 42 U.S.C. § 9613(b), provided that the controversy is ripe for review.

*Id.* at 72. Other courts have followed *Aminoil. E.g., Wagner Elec. Corp. v. Thomas,* 612 F.Supp. 736 (D.Kan.1985).

The court, in *SCA Services of Indiana v. Thomas,* 634 F.Supp. 1355 (N.D.Ind.1986), provided somewhat more analysis in reaching an identical conclusion. The facts in *SCA Services* are virtually identical to the facts in the case at bar. The EPA sent a letter to SCA stating that it was prepared to begin a RI/FS at an SCA hazardous waste site, even though the site was not listed on the NPL. The EPA inquired whether SCA wished to conduct the study, but the two were unable to come to an agreement. The EPA then indicated it would go ahead with the RI/FS itself. SCA filed a declaratory judgment action attacking CERCLA as a whole on constitutional grounds and attacking CERCLA's application to the SCA dump.

The court held that it had subject matter jurisdiction over the constitutional challenges to the statutory scheme. First, the court agreed with the EPA that the court had no jurisdiction over challenges to EPA actions within the statutory scheme.

> However, SCA is challenging the constitutional sufficiency of CERCLA itself. This court clearly has jurisdiction to consider a constitutional challenge to a federal statute under 28 U.S.C. § 1331.

*Id.* at 1359. As a second basis for subject matter jurisdiction, the court pointed to § 113(b).

> In addition, § 113(b) of CERCLA gives the district courts jurisdiction over any controversy involving the promulgation of a regulation (for which jurisdiction is vested exclusively in the D.C. Circuit—see § 113(a)). It would seem that a challenge to the constitutionality of an action taken under CERCLA, as opposed to a challenge to the statutory propriety of the action, would fall within the jurisdictional proscriptions of § 113(b).

*Id.*

Prior to the 1986 Amendments, then, the courts differed as to when constitutional challenges to CERCLA could be brought. The majority position, represented here by *Aminoil* and *SCA Services,* held that while statutory challenges to an EPA administrative order were precluded prior to an enforcement suit for reimbursement, a PRP could challenge the constitutionality of individual provisions of CERCLA. Other courts, such as the one in *Lone Pine,* held that all challenges, whether statutory or constitutional, were precluded prior to an enforcement suit.

Perhaps in response to this conflict, the Congress amended § 113(b) in 1986: "Except as provided in subsections (a) *and (h)* of this section, the United States district courts shall have exclusive original jurisdiction over all controversies arising under this chapter ..." (Emphasis added to indicate amendment.) New subsection (h) reads as follows:

(h) Timing of review. No Federal court shall have jurisdiction under Federal law other than under section 1332 of Title 28 (relating to diversity of citizenship jurisdiction) or under State law which is applicable or relevant and appropriate under section 9621 of this title (relating to cleanup standards) to review any challenges to removal or remedial action selected under section 9604 of this title, or to review any order issued under section 9606(a) of this title, or review any order issued under section 9606(a) of this title in any action except one of the following:

> (1) An action under section 9607 of this title to recover response costs or damages or for contribution.
>
> (2) An action to enforce an order issued under section 9606(a) of this title or to recover a penalty for violation of such order.
>
> (3) An action for reimbursement under section 9606(b)(2) of this title.
>
> (4) An action under section 9659 of this title (relating to citizens suits) alleging that the removal or remedial action taken under section 9604 of this title or secured under section 9606 of this title was in violation of any requirement of this chapter. Such an action may not be brought with regard to removal where a remedial action is to be undertaken at the site.

(5) An action under section 9606 of this title in which the United States moved to compel a remedial action.

The EPA argues that this new provision prohibits the challenge made by the Authority.

First, neither in its brief nor at oral argument did the plaintiff contend that its suit fell within one of the five exceptions to subsection (h). The court notes that subsections (h)(1), (2) and (5) are actions brought by the EPA. Subsection (h)(2) refers to an action brought by a person who has complied with an EPA order and seeks reimbursement for the expense of carrying out that order. This action falls into none of these categories. Nor can this be a citizen's suit under subsection (h)(4) because no EPA order has yet been issued.[3]

Rather than argue that this suit falls within an exception to § 9613(h), the Authority contends that this section should not limit its ability to assert constitutional challenges to CERCLA. Neither the Authority, the EPA, nor the court have found any cases which address this issue directly. Instead, the Authority relies on the cases decided prior to the 1986 Amendments.[4] This issue, then, is one of first impression and requires close examination.

Reading the language of § 9613(h) for its everyday meaning supports the notion that this subsection prohibits constitu-

---

**3.** Even if such an order had been issued, however, the court doubts whether this action would qualify as a citizen's suit. The section providing for citizens' suits was not meant to be used by PRPs as a challenge to EPA's actions:

> This section will enable interested communities to enforce the mandatory duties and requirements of the Act, as they pertain to response actions undertaken by EPA, Federal facilities, or responsible parties. The section provides a safeguard for citizens who have been unable to obtain redress from EPA, other Federal facilities, states or responsible persons.

House Report No. 253(I), 99th Cong., 1st Sess. reprinted in 1986 U.S.Cong. & Admin.News, 2835, 2890.

**4.** The Authority also relies on *Solid State Circuits, Inc. v. U.S. EPA*, 812 F.2d 383 (8th Cir. 1987). The court in that case, however, was reviewing an action taken by the EPA prior to the 1986 Amendments and did not apply subsec-

tion (h) or interpret it in any way except to hold that it confirmed "Congress' intent to preclude pre-enforcement review." *Id.* at 386 n. 1

In *Chemical Waste Management, Inc. v. U.S. EPA*, 673 F.Supp. 1043 (D.Kan.1987), the court did allow a challenge to CERCLA which did not fall within § 113(h), but the context was quite different than the one here. There, the plaintiff company challenged the EPA's actions in rendering the plaintiff's facility ineligible to receive and process hazardous wastes from hazardous waste sites. The plaintiff's facility processed and destroyed the wastes from such sites. The court held that § 113(h) was inapplicable because there was no intention to delay a cleanup. In fact, the suit would resolve the issue once and for all and would aid clean up. Second, the court held that § 113(h) contemplated that the party could bring its challenge later, but since there would be no suit for either reimbursement or for contribution, the plaintiff in that case would never have been able to challenge EPA's action.

tional as well as statutory challenges until the time proscribed by the statute. The provision explicitly states that federal courts shall not have jurisdiction to review "any challenge" except for those enumerated. Second, the provision precludes the use of 28 U.S.C. § 1331, federal question jurisdiction, as a grounds for subject matter jurisdiction. This direct reference undermines the reasoning of the *SCA Services* court that § 1331 provides an alternative basis for subject-matter jurisdiction.

Turning to Congressional intent, the legislative history of SARA also supports the EPA's position that constitutional challenges are precluded by § 9613(h). Congress described the effect of new section (h) in this way:

> *Preenforcement review*—Response actions or consent orders under section 104 and orders under section 106 may be subject to judicial review at the time the government seeks cost recovery or acts to enforce an order or otherwise obtain injunctive relief. Review may also occur pursuant to the terms of a consent decree, through a citizen suit alleging that a response action that had been taken was in violation of the requirements of the Act, or through a reimbursement suit by a potentially responsible party under the new procedures provided in this section. The section is intended to codify the current position of the Administrator and the Department of Justice with respect to preenforcement review: there is no right of judicial review of the Administrator's selection and implementation of response actions until after the response action have (sic) been completed ...

House Report No. 253(I), 99th Cong., 1st Sess., *reprinted in* 1986 U.S.Cong. & Admin.News, 2835, 2863. The following exchange during the hearings on the 1986 Amendments implies that constitutional challenges were also meant to be prohibited under § 9613(h):

> Mr. Thomas [EPA Administrator]: However, if we impose at that front end stage any kind of extensive judicial review, we in fact may take away all the effectiveness of those orders and even establish a

negative impact as far as moving forward with Superfund cleanup.

> Mr. Glickman [Rep. from Kansas]: When you say extensive judiciary review, are you implying that you might accept some form of accelerated review?

> Mr. Habicht [Ass't Attorney General for Land and Natural Resources, Dept. of Justice]: Mr. Chairman, briefly, this issue has been litigated under the 1980 statute quite extensively, and there have been a number of decisions over the last several months that address the fundamental questions of the constitutionality of the procedures set forth in that law. Virtually across the board now the courts are finding that the scheme is constitutional as currently constituted. Courts particularly cite the concern about litigation before remedy (sic) is implemented, and the fact that if litigation is designed to test a remedial decision ... inevitably the review process is going to involve a request for an injunction.

Superfund Reauthorization: Judicial and Legal Issues, Hearings before the Subcomm. on Admin. Law and Governmental Relations, H. of Rep. Judiciary Comm., 99th Cong., 1st Sess. at 226 (July 17, 1985). Our reading of this exchange is that the EPA and the Department of Justice took the position that because the courts had already upheld the constitutionality of CERCLA, constitutional challenges could also await EPA enforcement actions.

A Senate report written in the same session of Congress also implies that constitutional challenges are precluded:

> As several courts have noted, the scheme and purposes of CERCLA would be disrupted by affording judicial review of orders or response actions prior to commencement of a government enforcement or cost recovery action. See, e.g., *Lone Pine Steering Committee v. EPA*, 600 F.Supp. 1487 (D.N.J.1985). These cases correctly interpret CERCLA with regard to the unavailability of pre-enforcement review. This amendment is to expressly recognize that pre-enforcement review would be a significant obstacle to the implementation of response actions

and the use of administrative orders. Pre-enforcement review would lead to considerable delay in providing cleanups, would increase response costs, and would discourage settlements and voluntary cleanups.

S.Rep. No. 11, 99th Cong. 1st Sess. 58 (1985) (quoted in *J.V. Peters & Co. v. Administrator EPA*, 767 F.2d 263, 265 (6th Cir.1985)). It is noteworthy that the Senate committee specifically referred to *Lone Pine*. As described *supra*, the court in that case held that the plaintiff could bring neither constitutional challenges nor statutory challenges.

On the basis of this legislative history, the court holds that Congress intended that federal courts not have subject-matter jurisdiction to hear constitutional challenges to CERCLA at this stage of the proceedings under the Act. To hold otherwise would allow the filing of lawsuits that would impede the EPA's ability to clean up hazardous waste sites promptly and expeditiously. If the court were to consider the constitutionality of CERCLA, an injunction would have to issue to prevent any potentially unconstitutional actions from taking place. Such injunctions are precisely the type of impediment that the preenforcement review was meant to prohibit.

Before dismissing this suit, however, the court must determine whether the Congress has the power to limit the jurisdiction of the federal courts from hearing constitutional challenges. Naturally, the court is loath to allow unconstitutional conduct to occur, even if the conduct may be reviewed after its occurrence. It is hornbook law, however, that the lower federal courts are courts of limited jurisdiction, and the limitations are set by the legislative branch of government.

[T]he judicial power of the United States, although it has its origins in the Constitution is (except in enumerated instances, applicable exclusively to this [Supreme] court) dependent for its distribution, and for the modes of its exercise, entirely upon the action of Congress, who possess the sole power of creating the tribunals (inferior to the Supreme Court) for the exercise of the judicial power, and of investing them with jurisdiction either limited, concurrent, or exclusive, and of withholding jurisdiction from them in the exact degrees and character which to Congress may seem proper for the public good.

*Cary v. Curtis*, 44 U.S. (3 How.) 236, 244, 11 L.Ed. 576 (1845) (footnotes omitted).

Some courts have held that while this power is broad, the Congress may not exercise it to deprive a person of life, liberty or property without due process of law. In *Battaglia v. General Motors*, 169 F.2d 254 (2d Cir.1948), the court apparently held that if the Congress completely proscribed the federal courts from hearing a particular type of action, and no other relief was available, the action would violate the Due Process Clause of the Fifth Amendment.

▪ This is not the situation here. Rather, § 9613(h) only limits the time at which a constitutional challenge may be brought. This limitation does not absolutely withhold jurisdiction, since it only alters the character of judicial review. The 1986 Amendments also contemplate judicial review at the time that EPA seeks to enter premises to engage in a response action if a PRP contests such an entry. Section 9604(e)(3) gives federal officials the right of entry on to land to conduct such actions. Section 9604(e)(5) authorizes the EPA to commence a civil action to compel compliance with a request or an administrative order of entry. A PRP may then assert appropriate defenses:

In the case of interference with entry or inspection, the court shall enjoin such interference or direct compliance with orders to prohibit interference with entry or inspection unless under the circumstances of the case the demand for entry or inspection is arbitrary and capricious, an abuse or discretion, or otherwise not in accord with law.

42 U.S.C. § 9604(e)(5)(B)(ii). The court need not decide at this time whether this provision also permits constitutional challenges.

The statutory scheme at issue here resembles certain portions of the Voting

Rights Act of 1965, 42 U.S.C. § 1971, *et seq.*, which were considered in *City of Rome v. United States*, 450 F.Supp. 378 (D.D.C.1978), *aff'd* 472 F.Supp. 221 (D.D.C. 1979), *aff'd* 446 U.S. 156, 100 S.Ct. 1548, 64 L.Ed.2d 119 (1980). In *City of Rome*, pursuant to the Voting Rights Act, the Attorney General refused to preclear certain changes the City of Rome (City) had made in its election system. The City argued that the procedures the Attorney General used to determine whether to provide preclearance violated due process. The court held, however, that it had no subject-matter jurisdiction to review the Attorney General's actions, for the City could always bring an action for declaratory relief to determine whether the electoral changes met Voting Rights Act standards. The court held this to be so despite the fact that the Attorney General's actions would delay a City election:

> It is plaintiff's contention that even if Congress can preclude judicial review of allegedly illegal actions of an officer of the Executive Branch, it cannot, consistent with the doctrine of judicial supremacy established by *Marbury v. Madison*, 1 Cranch 137, 2 L.Ed. 60 (1803), preclude review of those executive actions which are alleged to be unconstitutional.

> Plaintiff's argument is wholly untenable. Congress has neither totally insulated the Attorney General's actions from judicial scrutiny nor totally deprived plaintiffs of judicial redress. Congress merely has established *an exclusive means* of obtaining "review" of the Attorney General's determination—a *de novo* proceeding in the District Court for the District of Columbia. There can be no doubt plaintiffs can obtain full and adequate redress by means of such a *de novo* proceeding and there can be no doubt that Congress has the power, "pursuant to its constitutional power under Art. II, § 1, to 'ordain and establish' inferior federal tribunals," to so limit the forums in which constitutional challenges may be brought. *South Carolina v. Katzenbach*, 383 U.S. 301, 331 [86 S.Ct. 803, 820, 15 L.Ed.2d 769] (1966).

450 F.Supp. at 382 n. 3 (parallel citations omitted) (emphasis in original).

This reasoning applies here. The court holds that because CERCLA affords a PRP an opportunity to bring its constitutional challenges when the EPA brings an action against it, Congress has properly exercised its power to limit the jurisdiction of the lower federal courts.

Finding that the court is without subject-matter jurisdiction, the court orders the entry of a judgment of dismissal in favor of the defendant in this matter.

IT IS SO ORDERED.